

Signed August 29, 2014.

Ronald B. King
United States Chief Bankruptcy Judge

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| JERRY W. SCARBROUGH, | § | CASE NO. 12-60683-RBK |
| | § | |
| DEBTOR | § | CHAPTER 7 |
| | § | |
| | § | |
| HELEN PURSER, SUE E. PURSER, | § | |
| GARY W. PURSER, JR., JOANN M. | § | |
| PURSER, AND ELIZABETH TIPTON | § | |
| | § | |
| VS. | § | ADVERSARY NO. 12-6031-RBK |
| | § | |
| JERRY W. SCARBROUGH | § | |

### OPINION

In this adversary proceeding, the Plaintiffs (the "Purser Family") seek nondischargeability of multiple debts stemming from a state court judgment rendered against Jerry W. Scarbrough ("Debtor").  Debtor filed a Chapter 7 bankruptcy petition on June 25, 2012, the same day as a scheduled state court trial in Bell County, Texas (the "Bell County lawsuit") in which he was a third-party defendant.  On June 26, 2012, the Court granted the Purser Family's motion to modify the

automatic stay to allow the Bell County lawsuit to proceed.  After obtaining judgment on the jury verdict against Debtor for over ten million dollars in the Bell County lawsuit, the Purser Family initiated this adversary proceeding.

I.  ***Jurisdiction and Venue***.

This Court has jurisdiction to render a final judgment in this core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).  Venue is appropriate under 28 U.S.C. §§ 1408 & 1409(a).

II.  ***The Parties***.

*Jerry Scarbrough* is an attorney in Killeen, Bell County, Texas, who is board certified in personal injury law.  He represented Melissa Deaton in the Bell County lawsuit against the Purser Family.  Because of his conduct, the Purser Family eventually joined him as a third-party defendant with Ms. Deaton and another individual, Denise Steele.  Helen Purser seeks nondischargeability of the Bell County judgment against him under §§ 523(a)(2)(A) and (a)(6), and the other members of the Purser Family seek nondischargeability under § 523(a)(6).

*Helen Purser* was married to Gary Purser, Sr. for 59 years until his death in 2011.  She is the mother of Elizabeth Tipton, Gary Purser, Jr., and Sue Purser.  She was a third-party plaintiff in the Bell County lawsuit and obtained judgment against Debtor for sanctions, fraud, civil conspiracy, and defamation.  In this adversary proceeding, she is the only plaintiff alleging nondischargeability based on § 523(a)(2)(A) against Debtor.  Along with her children and daughter-in-law, she also brought a claim against Debtor under § 523(a)(6).

*Elizabeth Purser Tipton* is the older daughter of Helen and Gary Purser, Sr.  Gary Purser, Jr. and Sue Purser are her brother and sister, respectively.  She was the last Purser Family member

added to the Bell County lawsuit, and through counsel, obtained a defamation judgment against Debtor. She is an attorney and elected to represent herself in this adversary proceeding. She seeks nondischargeability of the Bell County defamation judgment under § 523(a)(6).

*Gary W. Purser, Jr.* ("Bubba Purser") is his father's namesake and the son of Helen and Gary Purser, Sr. His sisters are Elizabeth Tipton and Sue Purser. He is married to JoAnn Purser, who is also a plaintiff. Along with his mother, wife, and sisters, Bubba Purser is asserting a § 523(a)(6) claim based on the Bell County defamation judgment against Debtor.

*JoAnn Purser* is Bubba Purser's wife and is related to the rest of the Purser Family by marriage. She obtained a defamation judgment against Debtor in the Bell County lawsuit and seeks to have it held nondischargeable under § 523(a)(6).

*Sue E. Purser*[1] is the younger daughter of Helen and Gary Purser, Sr. She is the sister of Elizabeth Tipton and Bubba Purser. She was a party in the Bell County lawsuit against Debtor and now seeks nondischargeability of the defamation judgment under § 523(a)(6).

III.     ***The Non-Parties****.*

*Gary W. Purser, Sr.* ("Gary Purser")[2] passed away on July 28, 2011. He was Helen Purser's husband of 59 years and the father of Elizabeth Tipton, Bubba Purser, and Sue Purser. He was a successful construction contractor and real estate developer in Killeen, Texas, who earned significant wealth during his lifetime. During the last few years of his life, his relationship with and monetary

---

[1] Sue Purser is the maiden name of Sue Van Zanten. She will be referred to as Sue Purser because that is consistent with the name on the case caption.

[2] For purposes of clarity, the Court will refer to Gary Purser, Sr., as "Gary Purser," and his son Gary Purser, Jr., as "Bubba Purser."

3

gifts to Melissa Deaton and Denise Steele led to his family's lawsuit against Ms. Deaton, Ms. Steele, and eventually, Debtor.

*Melissa Deaton* was a party in the Bell County lawsuit and was sued in connection with her interactions with Gary Purser.  She resided in Temple, Texas, which is also located in Bell County, and was close friends with Ms. Steele.  She retained Debtor as counsel in the Bell County lawsuit, but he had to withdraw from representing her when he became a third-party defendant.  The Purser Family obtained a judgment against her for fraud, civil conspiracy, defamation, and sanctions.  She is not a party to this adversary proceeding but testified as a witness on behalf of Debtor.

*Denise Steele* was a party in the Bell County lawsuit and was sued in connection with her interactions with Gary Purser.  The Purser Family obtained a judgment against her for fraud, civil conspiracy, and defamation.  She is not a party to this adversary proceeding.

*Shawn Richeson* was employed by Debtor on a contract basis as an information technology ("IT") technician in Killeen, Texas.  He handled several pieces of digitally recorded evidence that were relevant to the Bell County lawsuit.  He has injected himself into this controversy by recanting his previous testimony and destroying potentially relevant evidence.  This Court previously sanctioned him for spoliation of evidence.  The district court affirmed this Court's sanctions order and sanctioned Mr. Richeson for filing a frivolous appeal.  He is not a party to this adversary proceeding but testified as a witness for Debtor.

IV.    ***Background Facts Leading to the Bell County Lawsuit.***

Some background information is necessary to give context to the Purser Family's dispute with Debtor.  Gary Purser met Ms. Steele in 2006 at a Red Lobster restaurant in Killeen where she

4

was employed. At that time he was in his mid-seventies and she was in her late twenties. Ms. Steele lived with and had a romantic relationship with Clayton Olvera, whom she introduced to Gary Purser. Mr. Olvera was later hired by Gary Purser to manage an entity called Freytag Irrigation, Inc. Ms. Steele also introduced Gary Purser to her friend, Melissa Deaton, who was in her early forties.

At that time, Gary Purser's health was deteriorating and he was exhibiting early signs of dementia. His condition caused loss of memory, disinhibition, and hypersexuality, such that he began acting inappropriately and out of character. Gary Purser started visiting Ms. Steele at a Red Roof Inn hotel room in Temple, and later began seeing her at Ms. Deaton's house in Temple. He was giving the women large amounts of money and there was also a romantic aspect to the relationship.[3] During the first few years that Gary Purser was acquainted with Ms. Deaton and Ms. Steele, however, Gary Purser concealed their interactions.

Gary Purser terminated Clayton Olvera's employment, and in January 2009, a demand letter disclosed that Mr. Olvera intended to sue Gary Purser. It also alleged that Gary Purser had an affair with Ms. Steele and that he had been giving her $500.00 a week. The demand letter was circulated to the members of the Purser Family, marking the first time that any of the family became familiar with Ms. Steele.

The allegations about the extramarital affair and the monetary gifts caused the Purser Family to intervene to terminate what they viewed as an inappropriate relationship. Based on cash withdrawals from a home safe and from bank accounts by Gary Purser, they also believed that Ms.

---

[3]Despite the sworn denials of Ms. Deaton and Ms. Steele, Gary Purser stated on April 19, 2011, in a videotaped interview that he gave them thousands of dollars during their relationship. When asked if he and Ms. Steele engaged in some sort of sex act together, Mr. Purser admitted he had kissed and fondled her, but added, "Well, it's according to what you call a sex act . . . I damn sure didn't never have sex with her." (Def.'s Ex. 18 at 32–33).

Steele was taking advantage of Gary Purser financially. In January 2009, Elizabeth Tipton and Gary Purser's lawyer, Jack Crews, interviewed Ms. Steele about the allegations and requested that she stop seeing Gary Purser. The family also began tracking Gary Purser's movements with global positioning system devices installed on his car and cellular telephone. The family tracked him to Ms. Deaton's home on several occasions in February 2009. On one occasion, JoAnn Purser videotaped Gary Purser backing his vehicle out of Ms. Deaton's garage. On another occasion, several members of the Purser Family tracked Gary Purser to Ms. Deaton's home and a confrontation occurred that became known as "the Backyard Incident."

### A.     *The Backyard Incident*.

The Backyard Incident is relevant for two reasons. The first is that JoAnn Purser recorded video of a portion of the events.[4] The second is that this event served as a partial basis for the counterclaims Debtor advanced against the Purser Family on behalf of Ms. Deaton when he represented her in the Bell County lawsuit.

Despite the video, the events at the Backyard Incident were remarkably disputed; in particular, whether an assault against Ms. Deaton occurred. Elizabeth Tipton, Bubba Purser, and JoAnn Purser arrived at Ms. Deaton's residence in Temple, Texas, on February 25, 2009, while Gary Purser was sitting on the back patio with Ms. Deaton and Ms. Steele. Elizabeth Tipton and Bubba Purser entered the backyard through a gate. With her video camera recording, JoAnn Purser walked around the backyard to the front of the house and filmed through a glass door that provided partial visibility of the backyard.

---

[4] As shown to the Court at trial, Debtor uploaded the video to YouTube.com. As of the date of this Opinion, the video is still available at www.youtube.com/watch?v=i_t7DMeJF-g.

The video captured Elizabeth Tipton, Bubba and Gary Purser, and Ms. Deaton grouped together in discussion. Ms. Deaton threw a blanket over Gary Purser's head, and he and Bubba began grappling with one another's hands. JoAnn Purser then opened the front door, walked into the home, and exited through the glass sliding door to the backyard. There was verbal commotion and cursing. Ms. Deaton could be seen and heard on a telephone call to 911. The Purser Family gathered Gary Purser, exited the yard, and the camera stopped recording. Thereafter, the police arrived, interviewed the parties, and allowed the Pursers to leave with Gary Purser in tow. Ms. Deaton testified that after much persuasion and with Debtor's assistance, she was able to have the police investigate the incident almost two years after it occurred.

B.   *The Driveway Incident*.

Another significant event was the so-called "Driveway Incident" that happened on April 29, 2010, in Ms. Deaton's driveway. Once again, JoAnn Purser tracked Gary Purser to Ms. Deaton's residence in Temple, Texas. Gary and JoAnn Purser arrived at roughly the same time, and JoAnn Purser confronted Gary Purser before he could enter the residence. Gary Purser had brought approximately $10,000.00 in cash in his vehicle. Harsh words were exchanged by all parties, and JoAnn Purser was able to take the money away from Gary Purser as Ms. Deaton called 911 to report an altercation.[5] The Temple Police Department arrived at the scene, as did Bubba Purser. Upon Bubba Purser's arrival, the police permitted him to leave with over $9,000.00 of the cash, while Gary Purser was allowed to retain the remaining money. The police made a report of the incident.

---

[5] JoAnn Purser also called 911 to report the incident. As shown at trial, Debtor created a video that included the audio of the telephone call and several pictures Ms. Deaton took of the incident. He uploaded it to YouTube.com under the account name "PurserJoann." As of the date of this Opinion, it is still available at www.youtube.com/watch?v=bHCN7svus90.

7

This Driveway Incident was part of the basis of the counterclaim Debtor filed in the Bell County lawsuit on behalf of Ms. Deaton based upon her allegation that JoAnn Purser shoved her, which allegedly caused significant hip injuries to Ms. Deaton. Despite her alleged injuries, however, Ms. Deaton went to a previously scheduled doctor appointment that same day and did not report any injury. She did not begin to allege these injuries until many months later.

C.      *The Bell County Lawsuit*.

On May 11, 2009, Clayton Olvera filed a lawsuit in Bell County, Texas, against Freytag Irrigation, Inc., Gary Purser, individually and as trustee of the 1999 Gary Purser, Sr. Trust, and Helen, Bubba, JoAnn, and Sue Purser. Elizabeth Tipton was not a party to the lawsuit at that time. Jack Crews originally represented all of the defendants. Eventually, attorney Jeff Ray substituted as counsel to represent Helen, Bubba, JoAnn, and Sue Purser.

Ms. Deaton and Ms. Steele were joined as third-party defendants in the Bell County lawsuit in June 2010, when the Purser Family asserted claims against them. Ms. Deaton originally retained an attorney named John Redington to represent her. After filing her original answer and counterclaim for assault, personal injuries, and infliction of emotional distress against the Pursers, Mr. Redington referred Ms. Deaton to Debtor. Debtor officially appeared in the Bell County lawsuit on August 23, 2010. Debtor amended her pleadings to include a third-party action against Elizabeth Tipton, which joined her in the lawsuit. Ironically, the original Bell County lawsuit filed by Clayton Olvera was later settled with mutual releases and no money paid by either side. The third-party actions and counterclaims remained on file and were extensively litigated after realignment of the

8

parties. Notably, despite Debtor's aggressive demands for millions of dollars, Ms. Deaton nonsuited *all* of her counterclaims against the Purser Family at trial.

### D. *Helen Purser Filed for Divorce from Gary Purser*.

To stop the outflow of community funds from Gary Purser to Ms. Deaton and Ms. Steele, Helen Purser filed for divorce on May 18, 2010. Jeff Ray, Helen Purser's attorney, testified that he sought to utilize the divorce proceeding to obtain an expedited protective order. Helen Purser joined Ms. Deaton and Ms. Steele in this action, thus marking the time they officially became parties in state court. As previously noted, the women were also joined in the Bell County lawsuit a little over a month later.

At some point, Helen Purser moved out of the marital home she shared with Gary Purser. Eventually, she moved back to the home and Gary Purser moved out. Gary Purser later moved back with Helen to reconcile the marriage, and she dismissed the divorce proceeding. Near this time, Gary Purser's health worsened and he required in-home medical care.

### E. *The Secret Recordings*.

The most notorious pieces of evidence in this case were what the parties have consistently referred to as the "Secret Recordings." These were a series of recordings that began around the time that Helen Purser first filed for divorce from Gary Purser in the spring of 2010. These recordings were important for two reasons. First, they confirmed the Purser Family's suspicions about Ms. Deaton and Ms. Steele seeking to take advantage of Gary Purser financially. Second, Debtor knew of these recordings and had them in his possession, but intentionally failed to turn them over to the Purser Family despite specific and repeated discovery requests.

1.     *Content of the Secret Recordings*.

The Secret Recordings contained a few unremarkable conversations such as an apparent test of the recording device and another conversation between Ms. Deaton and Ms. Steele in a bathroom. Another brief recording simply stated that the date was May 15, 2010. Most relevant was a recording referred to as the "Two Good Bitches" conversation. The lengthy recording occurred while Gary Purser, Ms. Deaton, and Ms. Steele sat on the back patio of Ms. Deaton's residence. Gary Purser did not know he was being recorded.

The recording began with one of the women recounting a story she had heard where a wealthy woman died and left her entire estate to a dog. The women encouraged Gary Purser not to do such a thing with his money after he passed away. They suggested that he leave *them* his money because, as one of them exclaimed, "Don't leave all your money to your dog. You've got two good bitches right here!"

The recording was also salacious. The women discussed a fantasy with Gary Purser where they would travel with him to Las Vegas, and he would buy them fancy dresses and take them out gambling and to dinner. He would then get married to Ms. Deaton at a chapel. Thereafter, they would all return to the hotel, undress, and lounge in a hot tub together. Then the women would put on bathrobes and lie in bed with Gary Purser. The next evening, the trio would repeat the same activities. The women mentioned on the tape that they often created these types of impromptu fantasies with Gary Purser and that he seemed to enjoy hearing them.

The women also hatched a business plan with Gary Purser on the recording. Gary Purser owned some undeveloped acreage, and the women volunteered their assistance in developing it for

10

him. Gary Purser valued the deal at 10 million dollars, and the women suggested splitting the profits with 5 million dollars to Gary Purser and them taking 2.5 million dollars apiece. Ms. Deaton assured Gary Purser that they would "work it" to make it a profitable endeavor and attempted to somehow make the verbal discussions enforceable by stating "a promise is a promise."

Also captured on the recording were various discussions about Gary Purser's personal affairs. The women brought up the fact that Helen Purser was filing for divorce. They told Gary Purser that he could not trust his family members and his family was after his money. They encouraged Gary Purser to sign away all of his property before the divorce settled. They offered to help him do that and were willing to sign some papers to "do it legal." The women were concerned that the divorce was "going to get real ugly" because there was a lot of money at stake. The women suggested, and discussed at length, a plan where Gary Purser would purchase a safe to be kept at Ms. Deaton's home where he could keep all of his money out of his family's reach. Ms. Deaton mentioned this plan at least eight times. The women assured Gary Purser that he would have complete access to the safe and that only he would know the combination. Ms. Deaton expressed her confidence that she could prevent any of his family members from accessing it.

> 2. **_Concealment and Subsequent Discovery of the Secret Recordings in the Bell County Lawsuit_**.

The Secret Recordings were the subject of much controversy in the Bell County lawsuit, and Debtor was ultimately sanctioned and held liable for fraud for his failure to produce them. Jack Crews testified about his belief, based on the divorce discussion in the recording, that the "Two Good Bitches" recording captured a conversation that occurred on May 15, 2010. In another recording, the same date was stated.

11

Beginning in August 2010, the Purser Family began propounding discovery requests to Ms. Deaton for her to produce any discoverable evidence or known witness statements related to the Bell County lawsuit. Although Debtor did not file her initial answer and counterclaims, he later filed amended pleadings. He prepared her initial discovery responses that he served on September 2, 2010. These responses stated that Ms. Deaton did not possess any recorded statements involving any parties to the lawsuit. In actuality, Ms. Deaton was in possession of recordings of conversations between Gary Purser and herself at that time.

On December 2, 2010, Debtor again served discovery responses on behalf of Ms. Deaton, stating that she had no recordings of any parties or witnesses. Ms. Deaton's first deposition occurred on December 14, 2010, and Debtor attended as her defense counsel, but Ms. Deaton failed to produce any recordings in response to the subpoena duces tecum. Jeff Ray testified that he doubted the veracity of Debtor's responses on behalf of Ms. Deaton because discovery had already revealed more recorded conversations than Mr. Ray had experienced in his entire legal career and Clayton Olvera had mentioned other undisclosed recordings existed. At Ms. Deaton's second deposition on January 7, 2011, she referred to two recordings not produced to the Purser Family.[6] Yet she failed to produce either of these in response to the subpoena duces tecum.

Shortly after the January 2011 deposition, Ms. Deaton gave a recording device to Debtor that contained the Secret Recordings. Debtor took the recording device to the home office of Shawn Richeson. Mr. Richeson copied the recordings from the device and stored them in a server. He also enhanced the audio clarity of one of the recordings. He duplicated some or all of the recordings and

---

[6]These recordings were referred to as the "Redington" recording and the "Sister" recording.

placed them on a CD that Debtor picked up along with the actual recording device.  Debtor gave the

recording device back to Ms. Deaton, who testified that she either threw it away or gave it away.  She

also testified that it mysteriously reappeared in her house on her night stand shortly before the start

of trial in this adversary proceeding.

 For motivations that are unclear, Mr. Richeson produced the Secret Recordings to a friend

of the Purser Family on April 21, 2011.  The Purser Family received the Secret Recordings on

April 22, 2011.  That same day, Jeff Ray sent Debtor a letter again requesting production of any

recordings of Gary Purser.  Four days later, Debtor mendaciously responded that he had already

produced everything in his possession and Ms. Deaton's possession.  Debtor was unaware that the

Purser Family had obtained the Secret Recordings.  Despite providing the recording device to the

IT contractor himself, Debtor denied the existence of additional recordings during his sanctions

hearing on the matter.  Eventually, after multiple day hearings, the state court granted monetary

sanctions and contempt sanctions against Debtor in four separate orders, one of which stated that

Debtor was also sanctioned and held in contempt for violating confidentiality orders relating to Gary

Purser's medical records.  Debtor was sanctioned for "[r]epeated refusal and failure to produce audio

recordings through discovery, and . . . *intentional concealment and deception* regarding the existence

of audio recordings." (emphasis added).[7]

_____

[7]In granting contempt sanctions in the Bell County lawsuit, Judge Alan Mayfield stated:

> Your actions, Mr. Scarbrough, strike at the fabric of the freedoms that people just a few miles from
> here fight for.  Just a total disregard to the rule of law and the rules of evidence and the rules of
> discovery and the inherent powers of the Court.  Not once, not twice, three times now and still I'm not
> locking you up.
>
> I can tell you this much . . . if you're going to try and represent yourself and your clients by violating
> the Court's appropriate orders, *by hiding evidence*, and by seeking to prejudice witnesses by disclosing
> documentation in matters that the Court has ordered protected, you deserve to be locked up.  You do

F.    ***Summary of the Purser Family's Allegations Concerning Debtor's Conduct***.

The Purser Family alleged that on October 3, 2010, Debtor conspired with Ms. Deaton to orchestrate a false police report that JoAnn Purser called her and threatened to kill her.  Ms. Deaton testified that she called 911 because JoAnn Purser called her and made a death threat.  The Purser Family offered copies of Ms. Deaton's phone records.  Jeff Ray testified that he verified and collected all of the telephone numbers associated with any of the Purser Family or their businesses, and none matched any of the numbers depicted on Ms. Deaton's phone records.  On the contrary, the telephone records reflect that Ms. Deaton called Debtor both before and after she called 911 to report the alleged death threat.  The Purser Family contended the proximity of Debtor's contact with Ms. Deaton before and after her 911 call revealed a conspiracy to file a false report.  Debtor's testimony confirmed that Ms. Deaton called him and informed him that JoAnn Purser called her with a death threat, and he encouraged her to contact the authorities.  She later called him back to confirm that she had called 911 to make the report.

On November 8, 2010, Debtor filed a specious motion to appoint a guardian ad litem for Gary Purser.  The Purser Family cited this as an example of Debtor's harassment because Gary Purser was already represented by his attorney, Jack Crews, in the Bell County lawsuit.  Debtor testified that he filed this motion to call the Purser Family's bluff.  Throughout the lawsuit, the Purser Family had taken the position that Gary Purser's mental condition was deteriorating to the point where he could no longer control his actions and was susceptible to the influence of Ms.

---

it again I'm going to lock you up and 30 days will barely be long enough.

(Pls.' Ex. 120, at 134–36) (emphasis added).

Deaton and Ms. Steele, who were interfering with the community estate of Gary and Helen Purser. Because Debtor did not believe that Gary Purser was incompetent, he wanted to test whether his family would contest the ad litem proceedings, which would require them to take the opposite position from their theory in the Bell County lawsuit. On November 16, 2010, the state court denied the motion for the appointment of a guardian ad litem. Moreover, Ms. Deaton testified on multiple occasions that Debtor did not have her permission to initiate the guardian ad litem proceeding and that she did not agree that Gary Purser was incompetent. In another instance of Debtor acting without permission, he later filed a Motion for Summary Judgment on Ms. Steele's behalf although he did not represent her.

As Gary Purser's health declined in 2011, Debtor reported to the Texas Department of Adult Protective Services that the Purser Family was committing elder abuse. Debtor had no formal medical training, but his lay opinion was that Gary Purser was mentally competent and was overdosed on prescription drugs by his family in an effort to gain control of Gary Purser's money. The allegations of abuse were investigated by Adult Protective Services but found to be invalid. Physicians who treated Gary Purser at that time agreed that he had Frontotemporal Dementia[8] and prescription medication was administered per the doctors' orders to treat the symptoms.

Gary Purser passed away from pneumonia on July 28, 2011, in the hospital in Temple. Almost immediately, Debtor tried to have an autopsy performed to prove his theory that Gary Purser was not suffering from dementia or other mental defect. In a callous attempt to obtain an autopsy,

---

[8] According to a neuropsychological evaluation by his doctors, Gary Purser suffered from Frontotemporal Dementia with Klüver-Bucy Syndrome. The doctors found a global lack of capacity including financial and medical decision-making impairment, and lack of capacity to live independently.

15

Debtor reported to the funeral home, two local justices of the peace, the Temple Police Department, the Killeen Police Department, and the Texas Rangers that the Purser Family had "murdered" or "killed" Gary Purser by overdosing him on prescription drugs because they wanted his money. The authorities to whom Debtor spoke took no action to obtain an autopsy and the Killeen Police Department determined the accusations were "unfounded." While making the murder accusations, Debtor violated the Bell County court's confidentiality order by disclosing Gary Purser's medical information without court permission.

In August 2011, after Gary Purser's funeral and after he had been joined as a third-party in the lawsuit, Debtor cold-called Carolyn Purser Bolling, a cousin of the Pursers who lived out of state but had attended the funeral. Debtor implied that he represented Gary Purser and discussed his theories of alleged illegal drug use by Bubba and JoAnn Purser, and that the family abused and killed Gary Purser by overdosing him on prescription drugs. Debtor recorded the telephone conversation with Ms. Bolling, and the recording was admitted into evidence at the Bell County trial and in this adversary proceeding. Because of this telephone call, Debtor was held in contempt and monetary sanctions were assessed against him for once again violating confidentiality orders relating to Gary Purser's medical records.[9]

Seven weeks after Gary Purser's death, Debtor prepared and sent written interrogatories to Gary Purser, by and through his attorney, on September 19, 2011. Debtor was well aware that Gary Purser had passed away since he had within days requested an autopsy and alleged foul play by the

---

[9]The Bell County lawsuit contempt order stated: "Mr. Scarbrough's actions in telephoning Carolyn Bolling and discussing . . . portions of Gary W. Purser Sr.'s medical records or information contained therein are a total disregard for the rule of law, the rules of evidence, the rules of discovery, the Confidentiality Order, and the inherent powers of this Court." (Pls.' Ex. 124).

16

Purser Family. The interrogatories inquired into, among other things, sexual practices and habits of Gary Purser.

Finally, the so-called "Million Dollar Recording" was provided to the Purser Family along with the Secret Recordings, and was admitted in evidence in state court and in this Court. In that recording, Debtor discussed with his wife how each of the Pursers should have to pay one million dollars to him in settlement of Ms. Deaton's claims in the lawsuit. Debtor also stated that Gary Purser had dementia, although Debtor testified at trial that he made the statement sarcastically. Debtor apparently recorded his own conversation by accident, but the authenticity and genuineness of the recording were not seriously disputed.

## V.    *Nondischargeability of the State Court Judgment under 11 U.S.C. § 523(a)(6)*.

The Bell County jury unanimously found Debtor liable to Helen Purser and the Purser Family.[10]  On October 12, 2012, the state court rendered judgment on the verdict.  The judgment awarded damages to Helen Purser against Debtor, Ms. Deaton, and Ms. Steele, jointly and severally, in the amount of $3,060,000.00 for "(i) damages referable to willful, malicious and deliberate defamation while acting in concert, and (ii) damages referable to willful, malicious and deliberate fraud while acting in a conspiracy . . . ."  The judgment also awarded Helen Purser $2,000,000.00 exemplary damages against Debtor.

Regarding the rest of the Purser Family, Elizabeth Tipton recovered $750,000.00 plus $750,000.00 exemplary damages; Bubba Purser recovered $825,000.00 plus $750,000 exemplary damages; JoAnn Purser recovered $825,000.00 plus $750,000.00 exemplary damages; and Sue

---

[10]The counterclaims of Ms. Deaton were nonsuited at trial.

17

Purser recovered $455,000.00 plus $455,000.00 exemplary damages. All of these damage awards were based on defamation while acting in concert.

All totaled, the Purser Family recovered a judgment against Debtor for $10,620,000.00, plus five percent interest from the date of judgment.[11] This Court has previously held that collateral estoppel applies to the damages awarded in the Bell County lawsuit and the damage amounts will not be disturbed.[12] *Grogan v. Garner*, 498 U.S. 279, 284 n.11 (1991). The only remaining issue is whether Debtor's conduct made the debts nondischargeable in bankruptcy.

Section 523(a)(6) makes debts nondischargeable where a debtor causes "willful and malicious injury . . . to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). A nondischargeable debt under § 523(a)(6) must arise from "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). Further, "an injury is 'willful and malicious' where there is either an objective substantial certainty of harm or a subjective motive to cause harm." *Miller v. J.D. Abrams Inc.* (*In re Miller*), 156 F.3d 598, 606 (5th Cir. 1998). Accordingly, § 523(a)(6) actions apply more to categories of intentional torts "as distinguished from negligent or reckless torts." *Geiger*, 523 U.S. at 61. The creditor seeking to establish a § 523(a)(6) violation bears the burden to prove such a claim by a preponderance of the evidence. *Grogan*, 498 U.S. at 291.

---

[11]This figure does not include the trial court's award of sanctions against Debtor because this Court already granted partial summary judgment that the sanctions debt is nondischargeable under § 523(a)(6).

[12]The Court may apply collateral estoppel to these amounts even though the case is on appeal. *See Wash v. Moebius* (*In re Wood*), 167 B.R. 83, 85 (Bankr. W.D. Tex. 1994) (stating "[c]ollateral estoppel may be applied to a trial court finding even while the judgment is pending on appeal") (quotation omitted).

A.    *Willful and Malicious Defamation*.

The Court first considers the nondischargeability of the defamation judgments against Debtor because defamation damages are common to all of the Plaintiffs. The Purser Family's Second Amended Complaint describes some of Debtor's defamatory conduct as follows:

> [F]alse statements and reports that JoAnn Purser was threatening to kill Deaton; false statements and reports that the Purser Family had been abusing the elderly Gary Purser; false statements and reports that the Purser Family had murdered Gary Purser; false statements and reports that Bubba Purser and JoAnn Purser consumed illegal drugs; and the posting of slanderous videos about JoAnn Purser on YouTube and the misrepresentations related thereto.

(Pls.' Second Am. Compl., ¶ 29, ECF No. 31).

Notably, the Bell County jury verdict found Debtor liable for both defamation and defamation per se. "Defamation is a false statement about a person, published to a third-party, without legal excuse, which damages the person's reputation." *Fiber Sys. Int'l, Inc. v. Roehrs*, 470 F.3d 1150, 1161 (5th Cir. 2006) (citation omitted). In the case of defamation per se, the harm caused by the words is so obviously hurtful that they require no proof of injury to be actionable. *Id*. Falsely imputing a crime to another person is grounds for defamation per se. *Id*. False imputation of a crime requires "a statement that unambiguously and falsely imputes criminal conduct to a party." *Id*. (quotations omitted).

Debtor committed a willful and malicious act when he disseminated the false and outrageous allegations that the Purser Family abused and murdered their father. While a finding of either subjective or objective intent to cause harm would make the defamation debts nondischargeable under section 523(a)(6), *see Miller*, 156 F.3d at 606, the Court finds Debtor liable under either test.

19

The objective test analyzes whether a reasonable person would determine that a defendant's actions were substantially certain to cause harm. *See Mann Bracken, LLP v. Powers* (*In re Powers*), 421 B.R. 326, 335 (Bankr. W.D. Tex. 2009). False accusations of criminal conduct can create an objective substantial certainty of harm against the accused. *See McClendon v. Springfield*, 505 B.R. 786, 792–93 (E.D. Tex. 2013). Applying the objective test, it is not difficult to see that making spurious murder accusations to authorities, the funeral home, and relatives of the deceased would be substantially certain to cause harm. That is why Texas law treats false accusations of illegal and immoral conduct as defamatory per se.

A reasonable person would recognize that false reports to authorities of murder and elder abuse are substantially certain to cause harm to the alleged offender. The object of making the reports is to trigger an investigation into the alleged offender's conduct. If an investigation was not likely to follow the accusation, there would be no incentive to make the report.

Subjectively, it is even more obvious that Debtor willfully and maliciously intended to injure Helen Purser and her family. Debtor sought to delay the burial of Gary Purser—not for altruistic reasons—but as a strategic maneuver to obtain an autopsy. Three critical facts compel this conclusion.

First, the judgment has collateral estoppel effect. Applying Texas preclusion rules, "collateral estoppel bars relitigation of any ultimate issues of fact actually litigated and essential to the judgment in a prior suit . . . ." *Schwager v. Fallas* (*In re Schwager*), 121 F.3d 177, 181 (5th Cir. 1997) (quotations omitted). The jury found that Debtor's statements were defamatory per se. Included in the defamation per se jury question was the characterization that the Debtor made

20

statements "he knew were false or which he made with a high degree of awareness that were probably false, to an extent that he in fact had serious doubts as to the truth of the statement(s)." Therefore, the Bell County jury made a finding on the issue of the Debtor's subjective belief in the veracity of his own statements. The finding that Debtor knew the statements were false or had serious doubts as to their truth is inconsistent with an assertion of good faith reporting on his part. Moreover, Debtor freely admitted that he did not have any evidence to support his accusations other than limited medical information he gleaned from the medical records he obtained a few days before July 28, 2011. The medical records showed that Gary Purser's treating physicians agreed that he had dementia prior to his death and that he had not been mistreated by his family. Debtor presented no expert medical testimony at trial in the Bell County lawsuit or in this adversary proceeding to support his murder and abuse theories, but characterized the Purser Family's medical expert's opinions as "stupid."

Second, Debtor previously served as a Justice of the Peace. He was familiar with the powers of that office and knew that a Justice of the Peace had the authority to order an inquest into a death. Debtor maintained that Gary Purser did not suffer from dementia or another mental impairment. Frustrated that he had not been able to depose Gary Purser, Debtor viewed Gary Purser's death as the final opportunity to prove his case. He alleged intentional prescription drug overdoses killed Gary Purser because all he needed was one of the law enforcement authorities to accept his story and an autopsy would follow. Had any of the authorities suspected foul play in the death of Gary Purser, they would have notified the Justice of the Peace, who would have initiated an inquest.

21

A final critical piece of evidence demonstrates Debtor's malicious motives.  On July 29, 2011, mere hours after he learned of Gary Purser's death, Debtor wrote a letter to Jack Crews requesting an autopsy—not because he believed foul play was afoot—but because he wanted to prove Gary Purser did not have dementia.  The letter reads:

Dear Jack:

We were saddened by the news that Mr. Purser died yesterday in Temple.  I had a great deal of respect for him.  *As you know the main issue in this case is whether or not he was suffering from a mental illness due to dementia or another brain disorder.*  We believe that an autopsy would clear up this issue.  I suggest we ask an independent medical examiner to perform an autopsy here at the funeral home prior to his interment.

We are not intending to ask the court to order one, but without definitive evidence of a medical nature we will point out that an autopsy would have solved the question, but the family refused to have one performed.

This letter is not intended to be disrespectful to the family in their time of sorrow, but because they have put this issue before the court we think this would be the best way to resolve it.

Sincerely,

Jerry Scarbrough

(Pls.' Ex. 85) (emphasis added).  Of course, while requesting an autopsy directly from the Purser Family to resolve the "main issue" concerning dementia in Debtor's lawsuit, he was simultaneously contacting authorities to pitch his murder theory.  Jack Crews learned that Debtor contacted the funeral home to influence a halt to Gary Purser's burial based on murder allegations.  At 6:32 p.m. on July 29, 2011, Mr. Crews sent Debtor the following email with the subject line "Your conduct":

Mr. Scarbrough:

I just saw the letter you faxed earlier this date.  I write this email in response.

22

First, stop patronizing me. You never had any respect for Mr. Purser and you do not care about the feelings of his family now. What you did in calling the funeral home today and sending that letter is beyond the pale of any person capable of reasonable behavior. Your actions reveal your true intentions with perfect clarity—your words not meaningful.

I will not be surprised at anything you do or say if you think it will help squeeze nuisance money from Mr. Purser or his family. Your words and actions are reckless and you will be held legally accountable. Put aside whatever it is that drives you to sacrifice your reason and honor and just be quiet for a while.

A reckoning already awaits you at the courthouse. Do not make it worse.

Jack Crews

(Pls.' Ex. 86). Debtor viewed a time of grieving for the Purser Family as an opportunity to gain leverage in his lawsuit.

Apart from the unfounded murder accusations, Debtor acted in other ways that reinforce the conclusion that he intended to harm the Purser Family. Another example is the videos that he posted on YouTube.com of JoAnn Purser's video of the Backyard Incident and her 911 call following the Driveway Incident. Debtor admittedly created a bogus account name for "PurserJoann" and uploaded one video to that account.[13] The YouTube video played the audio of JoAnn Purser's call to the police following the Driveway Incident. The visual aspect of the video began with a picture of JoAnn Purser with large red lettering partially covering her face that reads "VOTED OUT." The picture was superimposed on a plain black backdrop that filled the frame. Underneath the stamped picture were large white words that read "JoAnn Purser, running for Killeen school board."

The video played the actual 911 call while displaying pictures of Gary and JoAnn Purser. Regarding the "VOTED OUT" caption, it is true that JoAnn Purser once held a seat on the Killeen

---

[13]He uploaded the other video to his own account of "Jerry Scarbrough."

23

City Council and no longer held that position. The fact that Debtor posted it to a fictitious account called "PurserJoann" illustrates the malicious intent behind the posting. The pictures and corresponding commentary were presented in a way that made it appear JoAnn Purser took $10,000.00 from Gary Purser and would not give it back to him. While such an event did occur, the presentation in the video provided no context. JoAnn Purser was portrayed as a thief without explaining why Gary Purser had brought $10,000.00 in cash to Ms. Deaton's home.

Debtor defended the video by describing it as an exercise of his rights as an eligible voter for the Killeen school board elections. He testified that he did not believe JoAnn Purser was a good candidate and that he would not vote for her. He posted the videos to inform the public of what kind of person he thought she was. It is clear that Debtor's subjective motive in posting the videos was to damage JoAnn Purser's reputation and candidacy for the school board elections, and to needlessly harass her in connection with the Bell County lawsuit. The right to free speech does not insulate Debtor from civil liability for willful and malicious defamation. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 301–02 (Goldberg, J., concurring).

B.  *Willful and Malicious Fraud*.

Helen Purser alleged Debtor committed fraud by:

[M]aking false and embarrassing demands and allegations related to the state court action; making groundless, fraudulent, and harassing claims in the state court action in an attempt to coerce a multimillion-dollar settlement from the Purser Family—and then lying about the secret recordings; falsely reporting that the Purser Family had been abusing Gary Purser, Sr.; and falsely reporting that the Purser Family had murdered Gary Purser, Sr.

(Pls.' Second Am. Compl., ¶ 28, ECF No. 31). The Bell County jury found Debtor committed fraud by failure to disclose and fraud by misrepresentation as those species of fraud were defined in the

24

jury charge. The judgment ordered that "Helen Purser have judgment and recover from [Debtor], Melissa Deaton, and Denise Steele, jointly and severally, in the amount of $3,060,000.00, in connection with the . . . damages referable to willful, malicious and deliberate fraud while acting in a conspiracy. . . ." The judgment also awarded an additional $2,000,000.00 in exemplary damages.

Although § 523(a)(2)(A) is the usual vehicle for seeking nondischargeability of a debt based on fraud, it is possible to assert a claim for willful and malicious fraud under § 523(a)(6). *See, e.g.*, ***Schubert Osterrieder & Nickelson PLLC v. Bain*** (***In re Bain***), 436 B.R. 918, 924 (Bankr. S.D. Tex. 2010) (finding that "[a]llowing Plaintiffs' state-law fraud claim to be asserted under § 523(a)(6) would not render § 523(a)(2)(A) superfluous"); *see also* ***Grogan v. Garner***, 498 U.S. 279, 282 n.2 (1991) (stating "[a]rguably, fraud judgments in cases in which the defendant did not obtain money, property, or services from the plaintiffs and those judgments that include punitive damages awards are more appropriately governed by § 523(a)(6)"). This is especially true where "the facts alleged in the fraud claim are the same underlying facts as those alleged in the [willful and malicious defamation] claim." ***Bain***, 436 B.R. at 924.

An injury that is recognizable for purposes of willful and malicious fraud is forcing another person to expend unnecessary money and time. *See* ***id***. (forcing a person to spend time and money to cancel hundreds of unwanted magazine subscriptions satisfied the injury requirement for a § 523(a)(6) fraud claim). The Fifth Circuit has indicated that presenting frivolous claims and engaging in deliberate and needlessly prolonged litigation is sufficient injury for purposes of § 523(a)(6). *See* ***Raspanti v. Keaty*** (***In re Keaty***), 397 F.3d 264, 274 (5th Cir. 2005). Abusing the

judicial process to cause unnecessary delay or harassment can serve as the basis for finding willful and malicious behavior. *Id*.

While neither case dealt specifically with nondischargeability of a fraudulent debt under § 523(a)(6), two Fifth Circuit cases shed light on this issue. In *In re Keaty*, 397 F.3d 264 (5th Cir. 2005), a Louisiana appellate court found that Keaty and his law partner committed sanctionable conduct by filing a frivolous claim for attorneys' fees against Raspanti. The Louisiana appellate court made findings "that the Keatys knew their claims had prescribed, that their answers to Raspanti's request for admissions were disingenuous, and that the proceedings by the Keatys were knowingly without foundation, crafted for the purposes of harassment, and designed to prolong the proceedings deliberately and needlessly." *Keaty*, 397 F.3d at 268 (citing *Keaty v. Raspanti*, 781 So. 2d 607, 612 (La. Ct. App. 2001)). After a remand for an evidentiary hearing and a subsequent appeal, Keaty was sanctioned in the amount of $107,605.95. *Id*. (citing *Keaty v. Raspanti*, 866 So. 2d 1045 (La. Ct. App. 2004)). Keaty eventually filed a Chapter 7 bankruptcy petition and Raspanti initiated an adversary proceeding to declare the sanctions award nondischargeable under § 523(a)(6) for willfully and maliciously causing injury by bringing the frivolous lawsuit. *Id*. Raspanti lost his collateral estoppel argument at the bankruptcy court and district court, and appealed to the Fifth Circuit.

The panel framed the issue as whether "under principles of collateral estoppel, the sanctions issue was 'actually litigated' . . . such that the Louisiana appellate court's findings barred the relitigation of the willful and malicious injury requirement of § 523(a)(6)." *Id*. at 269. In reversing the lower courts, the panel clarified the standards for evaluating the "actually litigated" component of collateral estoppel and held "[t]here is no question that the sanctions issue was actually litigated

26

in the state court." *Id*. at 272. The court did not end its inquiry there, however, and went on to evaluate "whether the state . . . court 'has made specific, subordinate, factual findings on the identical dischargeability issue in question—that is, an issue which encompasses the same prima facie elements as the bankruptcy issue. . . .'" *Id*. at 272 (quoting ***Dennis v. Dennis*** (***In re Dennis***), 25 F.3d 274, 278 (5th Cir. 1994)). In deciding that the state court's findings were on an issue identical to the dischargeability issue, the court observed "[b]oth § 523(a)(6) and the Louisiana [sanctions] statute require an inquiry into whether Keaty acted either with an objective substantial certainty of injury (to cause unnecessary delay) or a subjective motive to cause injury (to harass or to increase the cost of litigation needlessly)." *Id*. at 273. After quoting a critical portion of the Louisiana appellate court's findings, the panel decided:

> These are clear and specific findings as to Keaty's state of mind. They demonstrate that Keaty's motive in filing the frivolous claim for attorney's fees was to injure Raspanti (by harassing him). They also demonstrate that Keaty's actions were substantially certain to injure Raspanti, since deliberately and needlessly prolonging the proceedings would necessarily cause Raspanti financial injury. Thus, we conclude that the state appellate court's findings satisfy the elements of § 523(a)(6).

*Id*. at 274.

In ***Shcolnik v. Rapid Settlements Ltd***. (***In re Shcolnik***), 670 F.3d 624 (5th Cir. 2012), the willful and malicious conduct at issue was committed by a former company officer who "attempted to obtain one million dollars by falsely claiming an ownership interest in the company and threatening public exposure of alleged illegal activity." *Id*. at 626. More specifically, the court described a series of events that began when Shcolnik, the eventual bankruptcy debtor, was fired from his position as an officer of two companies. Allegations arose thereafter that:

> [Shcolnik] absconded with various documents from [the companies'] offices. Shcolnik then began threatening to disclose alleged criminal and regulatory violations

27

by [the companies] if they did not "buy-out" his "ownership interests." In emails, he referred to a "doomsday plan" which would be launched if Stewart Feldman, the primary owner of [the companies], did not "properly compensate" him for his "ownership interests. . . which appear to be worth in excess of $1,000,000." He threatened a "massive series of legal attacks . . . which will likely leave you disbarred, broke, professionally disgraced, and rotting in a prison cell," and expressed his hope that Feldman would be the victim of prison rape.

*Id*. at 626–27. In response, the companies initiated an arbitration proceeding against Shcolnik that sought declaratory judgment that he did not hold an ownership interest in the companies or related entities. The arbitrator held in the companies' favor and awarded them $50,000.00 in attorneys' fees, and a state court later confirmed the award.

Shcolnik filed bankruptcy and the companies sought to have the arbitration attorneys' fees award declared nondischargeable under § 523(a)(6). *Id*. at 627. After considering cross motions for summary judgment, the bankruptcy court granted Shcolnik's motion and the district court affirmed. The district court held that the companies "could not establish a genuine issue of material fact as to willfulness, because they did not actually pay Shcolnik the million dollars he demanded." *Id*. at 629. The district court "interpreted the Supreme Court to require that a debtor intend 'the alleged injury itself' in order to fulfill the willfulness component of 11 U.S.C. § 523(a)(6)." *Id*. (citing ***Kawaauhau v. Geiger***, 523 U.S. 57 (1998)). In a split opinion, the Fifth Circuit panel reversed the district court.

The companies argued on appeal that the attorneys' fees award should be held nondischargeable as a willful and malicious injury under § 523(a)(6) because "Shcolnik used the stolen documents, threats of criminal reports, and claims of ownership in the company in tandem as a scheme to extract $1,000,000 from them in the guise of a 'buyout' of his pretended 'ownership interests.'" *Id*. at 628. The panel noted that the companies "have neither alleged nor offered evidence that Shcolnik intended to inflict litigation costs on them, which is the debt for which they urge

28

nondischargeability." *Id*. at 629. Authoring the panel opinion, Judge Edith Jones provided a brief overview of the Fifth Circuit's interpretation of section 523(a)(6) following *Geiger*, and reiterated the standard that "an injury is willful and malicious where there is either an objective substantial certainty of harm or a subjective motive to cause harm." *Id*.

The opinion also made comparisons to *Keaty*. The majority summarized the facts of *Keaty* as, "[t]he debtors' intended injury was 'harassment' through baseless litigation, but their actions were 'substantially certain to . . . cause . . . financial injury.'" *Id*. (quoting *Keaty*, 397 F.3d at 274). Considering that both cases evaluated the relationship between the debtor's motive and a resulting injury, the *Shcolnik* panel observed that "this case is slightly different from that in *Keaty*: Shcolnik allegedly engaged in a course of contumacious conduct that required the [companies] to file meritorious litigation against him, resulting in the instant fee award; whereas in *Keaty*, the debtors pursued the burdensome suit that provoked a sanctions award against them." *Id*. After making this distinction, the panel opined that "[i]t would make no sense for the infliction of expense in litigating a meritless legal claim to constitute willful and malicious injury to the creditor, as in *Keaty*, while denying the same treatment here to the infliction of expense by a debtor's attempt to leverage an equally baseless claim through a campaign of coercion." *Id*. The panel found a genuine fact issue existed for trial because "Shcolnik's behavior resulted in willful and malicious injury if his claims of ownership were made in bad faith as a pretense to extract money from the [creditor companies]." *Id*. at 630. Finally, Judge Jones made a critical observation about the relationship between the debtor's conduct and the resulting injuries he caused: "[t]he litigation costs he forced upon [the

creditors] are different from the million dollar claim he made against them, but they were neither attenuated nor unforeseeable from his alleged intentionally injurious conduct." *Id*.

Judge Catharina Haynes wrote a partial concurrence and dissent. She stated that "[t]he effect of the majority opinion is to transform all litigation precipitated by aggressive demand letters into potential 'malicious' acts for purposes of non-dischargeability." *Id*. (Haynes, J., concurring and dissenting). Further, Judge Haynes lamented that "the majority opinion glosses over the lack of connection between the allegedly malicious acts and the arbitration award of attorneys' fees now sought to be rendered non-dischargeable." *Id*. The dissent went on to explain:

> We do not have a case setting out a test for where the quintessential demand letter ends and the parade of horribles suggested by the majority opinion begins. Wherever that line is, it is not crossed here, and I disagree with transforming the regrettable unpleasantness and aggressiveness that often attend the prelude to litigation into "coercive" or "contumacious" conduct so easily. Shcolnik's e-mail letters, however reprehensible they undeniably are, do not constitute either.

*Id*. at 631.

This Court shares Judge Haynes's concerns in **Shcolnik**. It is true that "transform[ing] *all* litigation precipitated by aggressive [behavior] into potential 'malicious' acts for purposes of non-dischargeability" would be inappropriate. *See Shcolnik*, 670 F.3d at 631 (emphasis added). Likewise, the Court disapproves of "transforming the regrettable unpleasantness and aggressiveness that often attend the prelude to litigation into 'coercive' or 'contumacious' conduct so easily." *See id*. Litigants and lawyers should not face punishment merely for attempting to enforce legal rights. But the Bell County jury found that Debtor *intentionally* utilized the litigation process to perpetrate fraud against Helen Purser. Debtor's actions clearly crossed the line between zealous advocacy and contumacious conduct.

30

Applied here, **Keaty** and **Shcolnik** recognize the sort of injury that Debtor caused to Helen Purser. As in **Scholnik**, Debtor used harassing and contumacious methods in an attempt to recover damages or coerce a nuisance settlement of claims made in bad faith. That the payday never came did not matter in **Shcolnik**, as the majority did not ignore the certain financial harm that resulted. Here, Helen Purser and her family spent over a million dollars pursuing and litigating the Bell County lawsuit.[14] Meanwhile, Debtor participated in a "parade of horribles" while defending Ms. Deaton (and later himself) by pursuing baseless counterclaims on her behalf, violating court orders, failing to produce the Secret Recordings, and attempting to initiate multiple meritless criminal investigations.

The jury found that Debtor, along with Ms. Deaton and Steele, committed fraud by misrepresentation and fraud by failure to disclose against Helen Purser. The jury also determined that they acted in concert and in a conspiracy in committing fraud against Helen Purser. The jury's exemplary damage award found that Debtor, Ms. Deaton, and Ms. Steele acted with either malice or gross negligence.[15]

The Bell County judgment also awarded Helen Purser sanctions for Debtor's discovery abuses in the amount of $54,261.50. The Court previously granted partial summary judgment in Helen Purser's favor on the sanctions issue under § 523(a)(6). Debtor contends that this prevents the Court from considering whether his discovery abuses factor into Helen Purser's § 523(a)(6) claim for willful and malicious fraud. The Court disagrees with Debtor's position.

---

[14]Jack Crews testified that his law firm billed $482,613.38 in connection with the Bell County lawsuit. He did not represent Helen Purser the entire time, but he did represent her initially. Jeff Ray, Helen Purser's other attorney, testified that his law firm had billed over $600,000.00 to represent her and her family during the Bell County lawsuit.

[15]Gross negligence would not meet the standard for causing a willful and malicious injury set forth in **Kawaauhau v. Geiger**, 523 U.S. 57 (1998).

Debtor's discovery abuses do not make up the entirety of Helen Purser's § 523(a)(6) willful and malicious fraud claim, but they do factor into Debtor's larger scheme to harm her. Throughout the Bell County litigation, Debtor filed frivolous motions and pleadings, and attempted to use extra-judicial tactics to gain advantage. Deposition transcripts, such as Debtor's deposition of Helen Purser, reveal immense hostility by Debtor against her. Other transcripts, such as Ms. Deaton's deposition, reveal Debtor's spirit of gamesmanship over discovery matters.[16] To be sure, Debtor's failure to produce the Secret Recordings and his violation of the medical records confidentiality order were met with monetary sanctions and contempt orders. But those instances were simply part and parcel of Debtor's overall scheme to harm and harass Helen Purser while seeking "to leverage a[ ] . . . baseless claim through a campaign of coercion." *Shcolnik*, 670 F.3d at 629.

For example, Debtor sent inflammatory written interrogatories to Gary Purser on September 19, 2011, approximately fifty-three days after his death. Debtor obviously knew that Gary Purser was deceased because he had already besieged various law enforcement officials with murder allegations surrounding Gary Purser's death. Yet he served offensive discovery on Gary Purser's attorney anyway.

The reality is that Debtor knew that Helen Purser would receive the discovery. The questions were not innocuous, but instead pried into Gary Purser's sexual history as if he were still alive. Debtor continued this line of questioning at Helen Purser's deposition. During deposition breaks, Helen Purser was upset by Debtor's questioning to the point where she was crying and shaking. In

---

[16]In one exchange where the Pursers' attorney asked why a photograph of Gary Purser that Ms. Deaton took during the Driveway Incident had not been produced, Debtor replied, "Well, hell, I'm not supposed to tell you about things you don't know about. I'm just supposed to tell you about things you ask about." (Pls.' Ex. 52).

32

the Bell County trial, an expert testifying about ethics, Alice Oliver-Parrott, had the opportunity to watch the deposition video. She testified "the questions that Mr. Scarbrough asked Mrs. Purser were in no way in furtherance of this litigation and did not pertain in any way to any issue that is in dispute here. He literally asked this woman about her mastectomy and whether or not her husband had ever fondled her breasts. I find that unforgivable." (Pls.' Ex. 1, vol. 7, at 60:5-11).

Jeff Ray, Helen Purser's attorney in the Bell County lawsuit, testified that on several occasions Debtor conveyed his intention to be "a thorn in [the Pursers'] side" and said his end goal was to "get millions out of them." Debtor made multiple oral demands to Jeff Ray to settle the case for one million dollars for himself and two million dollars for Ms. Deaton. The Million Dollar Recording between Debtor and his spouse also evidenced his malicious intention to somehow get millions from the Purser Family. Most critical, despite basing the bulk of Ms. Deaton's counterclaims on the Backyard and Driveway Incidents, Debtor freely admitted he knew Helen Purser was not present for either event. Yet he pursued baseless claims against her because he "had no reason not to." When a person wields the judicial process like a sword, he cannot expect that same process to shield him from liability for his actions.

Other actions Debtor took that rounded out his campaign of coercion were: encouraging Ms. Deaton to make an assault report of the Driveway Incident almost two years after the event occurred; initiating a baseless guardian ad litem proceeding without consent from his client to do so; filing a motion for summary judgment on behalf of Ms. Steele without her authorization; filing frivolous counterclaims for Ms. Deaton, which were nonsuited at trial; violating the confidentiality order with respect to medical records; and repeatedly denying the existence of recordings of which he had

33

possession. Debtor's pursuit of a scorched earth litigation strategy led to a debt that bankruptcy cannot discharge. Therefore, the Court finds Helen Purser's entire judgment against Debtor for fraud is nondischargeable under § 523(a)(6).

VI.     ***Nondischargeability of the State Court Judgment under 11 U.S.C. § 523(a)(2)(A)***.

In addition, Helen Purser seeks nondischargeability of her state court judgment for fraud by failure to disclose and fraud by misrepresentation under § 523(a)(2)(A). She contends that the Bell County judgment fits within the false pretenses, false representation, or actual fraud provisions of § 523(a)(2)(A). The Amended Complaint set out the basis for the § 523(a)(2)(A) theory as follows:

> As set forth in the state court verdict and final judgment, Defendant, acting individually and as a co-conspirator with third parties, perpetrated fraud upon the Purser Family. In short, Defendant lied to and about the Purser Family by making false and embarrassing allegations in the community and in connection with the state court action. All this in an effort to coerce and extort money from the Purser Family. And, when the Purser Family discovered the existence of certain evidence—i.e. secret recordings—that would expose Defendant's claims as groundless, fraudulent, and harassing and confirm their claims against Defendant, Defendant intentionally failed to produce and preserve such evidence. To their detriment, the Purser Family relied on the fraudulent misrepresentations about these potential claims—expending significant resources to investigate such claims. Also to their detriment, the Purser Family relied on the fraudulent misrepresentations regarding the existence (or non-existence) of evidence—expending significant resources to confirm or dispel the existence (or non-existence) of such evidence. Defendant's misrepresentations caused the Purser Family both economic and noneconomic injuries, as awarded in the state court verdict. Based on the foregoing, the debt owed to the Purser Family is nondischargeable under section 523(a)(2)(A) of the Bankruptcy Code.

(Second Am. Compl., ¶ 24, ECF No. 31).

At the summary judgment stage, Helen Purser urged that collateral estoppel mandated nondischargeability of the fraudulent debt because the elements for fraud presented to the jury matched the elements required for § 523(a)(2)(A). While the jury found reliance, the Court agreed

34

with Debtor's position that the justifiable reliance standard stated in ***Field v. Mans***, 516 U.S. 59 (1995), created a fact issue.

Debtor advanced several positions in his defense at trial. First, Helen Purser could not have justifiably relied on any of his actions because he interacted only with her attorneys. Second, he never obtained, or sought to obtain, "money, property, or services." Debtor argued that the money Ms. Deaton wrongfully obtained in the past could not be imputed to him merely because he agreed to represent her. Finally, he contended that although he never knew about the Secret Recordings, the fact that Helen Purser's attorneys were aware of them negates the theory that Debtor caused her to waste money on prolonged litigation expenses.

In an individual case, § 523(a)(2)(A) of the Bankruptcy Code excepts from discharge any debt for money, property, or services obtained by false pretenses, a false representation, or actual fraud. 11 U.S.C. § 523(a)(2)(A). Although one purpose of the Code is to give debtors a fresh start, § 523(a)(2)(A) is designed to protect victims of fraud. ***Tummel & Carroll v. Quinlivan*** (***In re Quinlivan***), 434 F.3d 314, 319 (5th Cir. 2005); *see also* ***Deodati v. M.M. Winkler & Assocs***. (***In re M.M. Winkler & Assocs.***), 239 F.3d 746, 749 (5th Cir. 2001). The creditor who is the victim of fraud must prove by a preponderance of the evidence that the debt is nondischargeable. ***Recoveredge L.P. v. Pentecost***, 44 F.3d 1284, 1292 (5th Cir. 1995) (citing ***Grogan v. Garner***, 498 U.S. 279, 286 (1991)); *see also* ***Gen. Electric Capital Corp. v. Acosta*** (***In re Acosta***), 406 F.3d 367, 372 (5th Cir. 2005).

The Fifth Circuit differentiates between "false pretenses and representations" and "actual fraud." ***Recoveredge***, 44 F.3d at 1292; *see also* ***Bank of La. v. Bercier*** (***In re Bercier***), 934 F.2d 689,

692 (5th Cir. 1991).  For a debtor's representation to qualify as a "false representation or false pretense" under § 523(a)(2)(A), it must have been:  (1) a knowing and fraudulent falsehood, (2) describing past or current facts, (3) upon which the other party relied.  *Recoveredge*, 44 F.3d at 1293 (citing *Allison v. Roberts* (*In re Allison*), 960 F.2d 481, 483 (5th Cir. 1992)).  The false representations must be made knowingly and fraudulently, but a debtor's silence regarding a material fact can also constitute a false representation under the Code.  *Caspers v. Van Horne* (*In re Van Horne*), 823 F.2d 1285, 1288 (8th Cir. 1987) (stating the bankruptcy courts have overwhelmingly held that a debtor's silence regarding a material fact can constitute a false representation actionable under § 523(a)(2)(A) when the omission touches upon the essence of the transaction).  Finally, the creditor's reliance on a debtor's false representation must be justifiable under the circumstances. *Field v. Mans*, 516 U.S. 59, 74–75 (1995).  The Court must determine whether the falsity of Debtor's representation was or should have been readily apparent to Helen Purser.

Debtor challenges whether false representations were made and whether there is evidence that Helen Purser justifiably relied on any representations.  At the heart of Helen Purser's fraud claim is the fact that Debtor intentionally failed to disclose and lied about the existence of the Secret Recordings.

The Secret Recordings demonstrate Ms. Deaton's and Ms. Steele's understanding of Gary Purser's financial affairs and their willingness to assist him in depleting the community estate.  Based on references to the pending divorce proceedings, the recordings took place in the spring or early summer of 2010.  Yet Helen Purser and her attorneys did not learn of the recordings' contents or existence until April 22, 2011.  In the meantime, as an officer of the court, Debtor had a duty of

36

candor and honesty to the court to truthfully answer discovery requests. *See* TEX. R. CIV. P. 13. Debtor staunchly denied the existence of any recordings to Helen Purser's attorneys after he had them in his possession. In turn, Helen Purser justifiably relied on her attorneys' informed advice based on false representations made by Debtor. *See Mans*, 516 U.S. at 74–75.

Knowledge of the recordings and their contents at the time Debtor's duty to produce them arose would have been extremely beneficial to Helen Purser in the Bell County lawsuit. The recordings put Debtor's then-client, Ms. Deaton, in a nearly indefensible position with respect to Helen Purser's claims against her. The pressure for Debtor's client to settle the lawsuit would have been immense in the face of recorded evidence of a scheme to defraud Helen Purser's marital estate. Armed with the recordings, Helen Purser's lawyers could have prepared a strong case for trial in little time. Knowledge of the Secret Recordings would have reduced litigation costs because, without them, it took longer to build a case based on circumstantial evidence. The lawyers spent significant time and resources to discover the existence of the Secret Recordings, and had to litigate further to establish their authenticity because of Shawn Richeson's involvement.

Moreover, knowledge of the Secret Recordings would have alerted Helen Purser to the potentially massive outflow of community funds much earlier in the proceedings. Because of Clayton Olvera's allegations, events such as the Driveway Incident, and the disappearance of large amounts of cash, Helen Purser knew that Gary Purser made gifts to the two women. Without the Secret Recordings, however, she had no way of knowing the magnitude of what the women were planning. The women seriously suggested Gary Purser keep all his money at Ms. Deaton's house in a safe to prevent the Purser Family's access to it. Instead, Helen Purser remained misinformed, the women

were able to keep the gifts and had the opportunity to receive more, and Debtor attempted to leverage frivolous counterclaims for nuisance money.

"This circuit imputes fraud to debtors only if the fraudulent representations were made by a formal partner or agent." *Quinlivan*, 434 F.3d at 319. When an agent is utilized to accomplish fraud, the "debt . . . cannot be discharged even if the debtor did not know or had no reason to know that his agent was acting fraudulently." *Id*. at 320. State law is used to analyze the relationship between the parties. *Id*. at 319.

Since Helen Purser never gave him anything, Debtor believes § 523(a)(2)(A) is inapplicable to his situation. Section 523(a)(2)(A) does not include a "receipt of benefit" requirement. *Winkler*, 239 F.3d at 749. Instead, "[t]he statute focuses on the character of the debt, not the culpability of the debtor or whether the debtor benefitted from the fraud." *Id*. Nonetheless, Debtor emphasizes that the statutory language does include an "obtained" requirement. Although he did not cite any cases in support of this position in his post-trial brief, at the summary judgment stage he relied on *In re Bain*, 436 B.R. 918, 922 (Bankr. S.D. Tex. 2010), for the proposition that "[e]ven though the debtor need not be the person who obtained money, property, services, or credit as a result of the fraud, someone must have obtained something." *Id*.

Assuming that *Bain* correctly states the requirements of section 523(a)(2)(A), Debtor ignores the fact that the Bell County jury found he both conspired and acted in concert with Ms. Deaton and Ms. Steele.[17] It is indisputable that Ms. Deaton and Ms. Steele obtained something from the

---

[17]The jury charge did not define the phrase "act in concert" but it did define conspiracy:

> To be part of a conspiracy, more than one person must have had knowledge of, agreed to, and intended a common objective or course of action that resulted in the damages to Helen Purser. One or more persons involved in the conspiracy must have performed some act or acts to further the conspiracy.

38

conspiracy to defraud Helen Purser of funds from her community estate. Admitted in both this adversary proceeding and the Bell County lawsuit was a handwritten note by Gary Purser that memorialized cash gifts to the two women. (Pls.' Ex. 7). Next to the notation "Cash to Parties" Ms. Steele's name appears with the amount of $70,000.00 beneath it, and Ms. Deaton's name appears with the amount $6,000.00 beneath it. (*Id*.). Further, Clayton Olvera testified at his state court deposition that Gary Purser helped purchase a Toyota Camry for Ms. Steele by giving her $5,000.00 every other week, provided her weekly payments of approximately $500.00 for a time, helped pay for real estate classes she attended, purchased jewelry for her, and provided somewhere between $2,000.00 to $5,000.00 for Ms. Steele and Mr. Olvera to rent a trailer. (Pls.' Ex. 38). Ms. Steele testified at her deposition that Gary Purser gave her sister $1,000.00, that he gave her multiple unspecified amounts for purposes of starting a sports bar business, that he gave her $4,000.00 to purchase the Toyota Camry, and that he paid for her real estate classes. (Pls.' Ex. 152-E). During the Driveway Incident on April 29, 2010, Gary Purser drove to Ms. Deaton's house with approximately $10,000.00 in hand.[18] Other testimony from the Purser Family likewise recounted how significant amounts of Helen Purser's community estate was given to Ms. Deaton and Ms. Steele.

---

Each co-conspirator is responsible for all acts done by any of the conspirators in furtherance of the unlawful combination.

Pls.' Ex. 152-A.

[18] Ms. Deaton testified during this adversary proceeding that she never accepted any money or benefits from Gary Purser. The Court finds that Ms. Deaton's testimony was not credible because of extensive evidence to the contrary. In addition, on multiple occasions she mentioned that her alcohol use, combined with her extensive reliance on prescription drugs, caused her to be in a "blurred" or "blacked out" state during many of the events in question.

39

In a videotaped interview admitted in evidence in this Court, Gary Purser spoke with Jack Crews about the money he gave the two women.  (Def.'s Exs. 17 & 18).  Regarding Ms. Deaton, Gary Purser stated he gave her $1,600.00 for a fence repair; $4,200.00 for a roof repair; $600.00 for medicine; approximately $500.00 for her sister's car and house payment; and approximately $1,000.00 in small increments to pay for miscellaneous bills.  Regarding Ms. Steele, Gary Purser acknowledged that he gave her $3,500.00 for medical bills; $12,000.00 to pay for a medical operation; between $3,000.00 and $6,000.00 to help her purchase the Toyota Camry; $300.00 for replacement car tires; and approximately $500.00 in weekly cash payments.  He also stated that he bought her a necklace worth $1,400.00 and a watch worth $400.00.  The main reason he hired Clayton Olvera was because he believed Ms. Steele would benefit from Freytag Irrigation if it was successful.  Realizing that Ms. Steele lived with Olvera, Gary Purser also cut their monthly rent by $250.00 for her benefit when they moved into a duplex that he owned.  Gary Purser stated that he paid her $500.00 to $1,000.00 on ten to fifteen occasions when she met with him at a Red Roof Inn hotel and had sexual contact.  He believed this arrangement lasted until some point in 2010.  In total, Gary Purser provided a rough estimation that he gave Ms. Steele between $40,000.00 and $50,000.00.

In light of this evidence, Debtor cannot contend that no one obtained anything from the scheme to defraud Helen Purser.  Debtor's client, Ms. Deaton, along with Ms. Steele, obviously obtained money and gifts from Helen Purser's marital estate and Debtor sought to ensure that they not only kept what they had, but that they all would receive more in the form of damages or nuisance money.

Debtor's alternative position is that Helen Purser could not have justifiably relied on his actions and misrepresentations because he interacted with her attorneys rather than with her. Debtor fails to provide any legal authority in support of this position. Helen Purser justifiably relied on information that she learned from her attorneys, who obtained the information directly from Debtor.

In sum, the Court finds that Helen Purser justifiably relied upon Debtor's repeated knowing and fraudulent falsehoods in the Bell County lawsuit about the existence of the Secret Recordings and the legitimacy of the positions he asserted for Ms. Deaton. *See Recoveredge*, 44 F.3d at 1293. The Bell County judgment for fraud is nondischargeable under § 523(a)(2)(A). This includes the damage awards for past and future mental anguish and exemplary damages because "once it is established that specific money or property has been obtained by fraud . . .'any debt' arising therefrom is excepted from discharge." *Cohen v. de la Cruz*, 523 U.S. 213, 218 (1998).

VII.    ***Affirmative Defenses and Privilege***.

Finally, Debtor asserts a variety of privileges and the First Amendment as affirmative defenses. The state court either rejected these defenses or Debtor did not assert them in the Bell County lawsuit, which was the appropriate forum. Either way, the Court finds that Debtor's defenses are precluded by collateral estoppel or without merit.

Under Texas preclusion rules, "collateral estoppel bars relitigation of any ultimate issue of fact actually litigated and essential to the judgment in a prior suit . . . ." *Schwager v. Fallas* (*In re Schwager*), 121 F.3d 177, 181 (5th Cir. 1997) (quotations omitted). "The requirement that an issue be 'actually litigated' for collateral estoppel purposes simply requires that the issue is raised,

contested by the parties, submitted for determination by the court, and determined." ***Keaty***, 397 F.3d at 272.

In the Bell County lawsuit, Debtor's First Amended Motion for Judgment Notwithstanding the Verdict contended that attorneys are entitled to a qualified immunity privilege; defamation must refer to specific individuals instead of a group; and the First Amendment protected Debtor's statements. (Pls.' Ex. 48, vol. 14, at 9867–84). The motion also challenged the sanctions judgments and asserted defenses of a legal duty to report criminal activity, statutory immunity in reporting elder abuse, and state and federal constitutional rights to speak freely about matters of public record. (***Id***.). Therefore, these defenses were "raised, contested by the parties, submitted for determination by the court, and determined" when the Bell County court denied the motion and rendered judgment on the verdict. (***Id***. at 9999–1000); ***Keaty***, 397 F.3d at 272.[19]

VIII.    ***Conclusion***.

For the reasons stated in this Opinion, the Bell County lawsuit judgment against Debtor is nondischargeable under section 523(a)(2)(A) and (a)(6) of the Bankruptcy Code. This Opinion shall serve as the Findings of Fact and Conclusions of Law of the Court pursuant to Fed. R. Bankr. P. 7052 and Fed. R. Civ. P. 52(a)(1). Pursuant to Rule 7058, a separate judgment will be rendered contemporaneously herewith.

# # #

---

[19]Because Debtor is precluded from contending his statements were protected by the First Amendment, the Court will not address his unsupported argument that the First Amendment preempts section 523(a)(6).